United States District Court for the District of Columbia Circuit

1:19-V-02675

Evam Gahr
Washington Gadfly
New York Post columnist for Eric Breindel

Vs.

Heritage Foundation
Kay Cole James
Katrina Trinko
Rob Bluey

LET THIS BE FILED

Signature

Date    3/6/20

RECEIVED
Mail Room

FEB 2 5 2020

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## Preliminary Opposition to Defendant's Spurious Motion Asking Court to Sanction Me for Supposedly Filing a Frivolous Lawsuit

1. Yeah, well, now that the CPUSAesque Kay Cole James and the mendacious Heritage general counsel Chris Byrnes (1) didn't get very far by unleashing their armed guard on my Same Day Process subpeona server when he came to Heritage to serve them this lawsuit, which I filed only after they ignored repeated cease and desist lettters, they have embarked on a new tactic: ask the Court to sanction me for filing it. ~~Exhibit~~ -NR

2. The only frivolity here is on the part of Heritage asking the Court to sanction me for filing a lawsuit that the Court hasn't even ruled on yet.

1. Last year, I reported Chris Byrnes to the attorney misconduct division of the District of Columbia Court of Appeals for knowingly making materially false statements about me to the DC Superior Court judge who had my employment discrimination case against Heritage. To convince the judge Heritge might need to bar me form their events because I was harassing Heritage employees and counsel Lauren Goetzl, ~~he said~~ he said something like during "each week" of the litigation I sent "dozens" of emails to Heritage "employees" and Ms. Goetzl. Dozens would mean at least 36. Heritage employees would be minimnally three. Plus, Miss Goetzl. The litigation had been going on for 16 weeks. That would be, minimally, 2304 emails. Mr. Byrnes had been given all the emails. The total was maybe 30. So, he was only off by 2204.



3. Heritage's motion is a series of specious and facile conclusatory arguments that even if true would be legally immaterial to the issue at hand.

4. Even if I am wrong that Heritage events are not public accommodtions that hardly establishes any frivolity on my part for claiming they are.

5. This lawsuit was clearly filed in good faith.

6. I sent Dan Farrington a draft of it and told him I was going to file it unless Heritage either stopped bannning me from their events or gave me a legitimate non-discriminatory reason for doing so. He didn't respond.

7. The lawsuit was filed after a DC Superior Court hearing where Heritage made its illegal retaliation and discrimination quite plain.   Exhibit-1

8. I am a journalist. I don't put anything under my name that is frivolous.

9. I write about an expose employment discrimination lawsuits all the time.   Please see accompanying exhibts. I am widely considered to have the same sophistiated knowledge of civil rights laws that many lawyers do.

10. Kay Cole James and Rob Bluey and Dan Farrington don't even believe what they are telling the Court because they are not saying it pubicly. Rob Bluey is the Heritage

1. Last year, I reported Chris Byrnes to the attorney misconduct division of the District of Columbia Court of Appeals for knowingly making materially false statements about me to the DC Superior Court judge who had my employment discrimination case against Heritage. To convince the judge Heritge might need to bar me form their events because I was harassing Heritage employees and counsel Lauren Goetzl, h said something like during "each week" of the litigation I sent "dozens" of emails to Heritage "employees" and Ms. Goetzl. Dozens would mean at least 36. Heritage employees would be minimnally three. Plus, Miss Goetzl. The litigation had been going on for 16 weeks. That would be, minimally, 2304 emails. Mr. Byrnes had been given all the emails. The total was maybe 30. So, he was only off by 2204.

spokesman. I have repeteacdly acted him and Heritage in emails to reporters. But he hasn't responded. But he responds to criticism from other prominent journalists.

11. I am hoping the Court can give me three weeks to file a complete response to Heritage's motion.  Per previous filings, I am being treated for unipolar depression and panic attacks and  PTSD (the lattter two stemming from Hudson Institute fellow Michael Horowitz, in conspiracy with OMB general counsel Jay Lefkowitz, criminally harassing my father to shut me up after  I told him I knew the Bush White House got me fired from Hudson and I was going to ask hudson donors about it.)

12. Sometimes, per the report from my psychologist Steve Zurrow, I am highly functioning. Other times I am severely cognitivley impaird and unable to write or concentrate.

13. People in this country are reallly ignorant about mental illness.  They think it is binary. Mental illness is like physical illness. People have good days and they have bad days.

Respectfully submitted for the Court's consideration with faith in the American People,

02|20|2020

202 - 517 - 7982

1. Last year, I reported Chris Byrnes to the attorney misconduct division of the District of Columbia Court of Appeals for knowingly making materially false statements about me to the DC Superior Court judge who had my employment discrimination case against Heritage. To convince the judge Heritge might need to bar me  form their events because I was harassing Heritage employees and counsel Lauren Goetzl, h said something like during "each week" of the litigation I sent "dozens" of emails to Heritage "employees" and Ms. Goetzl. Dozens would mean at least 36. Heritage employees would be minimnally three. Plus, Miss Goetzl. The litigation had been going on for 16 weeks. That would be, minimally, 2304 emails.  Mr. Byrnes had been given all the emails. The total was maybe 30. So, he was only off by 2204.

Exhibit-NR -
----Original Message-----
From: Same Day Process Service, Inc. <update@samedayprocess.com>
To: evangahr <evangahr@aol.com>
Sent: Wed, Nov 6, 2019 11:39 am
Subject: Status on Your Account#(Evan Gahr)

# Status Items

Status on Your Account: Evan Gahr
Serve On: Heritage Foundation
Court Case: 19-cv-02675-APM

| Date and Time | Jobnum | Address | Event Type | Detail |
|---|---|---|---|---|
| 11/01/2019 at 14:11 | 248168 | 214 Massachusetts Ave., NE Washington, DC 20002 | Attempt | Upon my arrival I stated my purpose to the security receptionist. She did not know who to call. I suggested she call Ms. Trinko. She called over the security supervisor to speak to me. He was a 40 year old white male with a security badge and firearm. He stated I am not allowed to serve people on the premises and asked me to leave. I explained I am not serving an individual but the entity. He continued to repeat that I am not allowed to serve on the premises and asked me to leave. |

https://nypost.com/2020/02/08/muslim-state-department-ex-employee-sues-pompeo-for-discrimination/

A Muslim State Department ex-employee is suing Secretary of State Mike Pompeo and the agency for allegedly refusing to let her work from home on Ramadan.

Azza Zaki, 62, says she asked to telecommute twice a week during the Muslim holiday in 2017, according to the federal lawsuit she filed in June in Washington, D.C., seeking $500,000.

Zaki, who worked in the department responsible for handling complaints from foreign au pairs working in the United States, said she routinely made the request during Ramadan and had not had any issue for the previous seven years.

The suit alleges that after Zaki made her request, she was "subjected to ridicule" and "harassing emails" as well as "eye-rolling, dirty looks, huffing and puffing when she spoke [and] being overly criticized about her work product." Zaki says she was also unfairly placed on "performance improvement plan," something her attorney said was part of an effort to ultimately fire her.

"It was humiliating. It was insulting. It was something I have never experienced," Zaki told The Post. "They are ignorant about the religion. This is discrimination and ignorance. Nobody bothered to come talk to me and ask why is this important. Why is it that you need to be at home. I would have explained."

She retired in 2018 less than a year after filing an Equal Employment Opportunity complaint against her supervisors, saying tension at work had become too much.

"I could not go through being sick all the time and stressed all the time. Not sleeping," she said. "I was constantly thinking about all the problems at work and really doubting myself."

The story noted that the lawsuit was first reported by the Washington Daily

1. Last year, I reported Chris Byrnes to the attorney misconduct division of the District of Columbia Court of Appeals for knowingly making materially false statements about me to the DC Superior Court judge who had my employment discrimination case against Heritage. To convince the judge Heritge might need to bar me form their events because I was harassing Heritage employees and counsel Lauren Goetzl, h said something like during "each week" of the litigation I sent "dozens" of emails to Heritage "employees" and Ms. Goetzl. Dozens would mean at least 36. Heritage employees would be minimnally three. Plus, Miss Goetzl. The litigation had been going on for 16 weeks. That would be, minimally, 2304 emails. Mr. Byrnes had been given all the emails. The total was maybe 30. So, he was only off by 2204.

Exhibit - H

https://www.huffpost.com/entry/family-research-council-sexual-harassment_n_2322995

The former director of women's and reproductive health at the Family Research Council, a prominent Christian conservative advocacy group, is suing the organization, claiming it retaliated against her and fired her after she filed a sexual harassment complaint against her boss.

According to court documents first obtained and reported by journalist Evan Gahr, former FRC employee Moira Gaul, 42, filed a complaint in 2009 with the District of Columbia Human Rights Commission in which she accused her supervisor of gender discrimination. She claimed that her boss, the director of the Center for Human Life and Bioethics at the time, referred to the use of birth control pills as "whoring around," addressed emails to her with the words "Hi cutie," pressured her to attend parties, and referred to her as a "young, attractive woman."

"His attitude toward me and other women was rude, belittling, and at times, angry," she wrote in the complaint.

Gahr identified Gaul's former supervisor as prominent anti-abortion lawyer William Saunders, who now works at the anti-abortion group Americans United for Life. Saunders and his attorney, William J. Hickey, did not respond to requests for comment on the case.

The FRC fired Gaul shortly after she filed the complaint, citing a loss in federal funding for abstinence — Gaul's area of expertise — and the need for someone with more experience on abortion issues. Gaul claims the FRC also retroactively canceled her health insurance for the time that she was on short-term disability for systemic lupus.

While the original sexual harassment complaint was settled in July 2009, Gaul and her attorney, Shannon Stokes, are currently suing the FRC for illegally retaliating against her. The suit claims that Gaul had received excellent reviews and no reprimands at the FRC up until she filed the gender discrimination complaint. Then, three months after she was fired, abstinence funding continued t

o the FRC, and the organization "created a new position with duties substantially similar to those previously performed by Ms. Gaul."

J.P. Duffy, vice president of communications at the FRC, told The Huffington Post that "D.C.'s Office of Human Rights made no finding" on the gender discrimination case, "and the case was withdrawn." Duffy did not comment on the retaliation case, which is ongoing.

The FRC argued in its motion for summary judgment that Gaul cannot prove that she was fired as a result of her harassment complaint. And because the original complaint was dropped, Gaul's lawyers are forbidden from asking her about the gender discrimination in court.

Stokes told The Huffington Post that Gaul does not want to comment publicly on the case, which may have adversely affected her employment prospects. According to Gahr, Gaul "has sought work with numerous conservative organizations since her dismissal, but remains unemployed despite an impressive resume."

*Do you have information you want to share with HuffPost? Here's how.*



# WASHINGTON GADFLY EVAN GAHR

FRIDAY, SEPTEMBER 06, 2019

DC Judge Pulls the Rug Under Heritage's Neo-Racist Schoolyard Bully Tactics
Tucker Carlson, Louis E. Chimpstein & Me
*How "everybody" in Washington acts when they think "nobody" is watching*

Washington, DC
September 6, 2019

Superior Court of the District of Columbia Judge
**Fern Flannagan Sadler** today basically told
**Heritage Foundation** president **Kay Cole James**
 and general counsel **Chris Byrnes** to stop threatening
Evan Gahr with expulsion if he attends their
September 10 conference/public accommodations--headlined
by former GOP congressman **Jason Chaffetz**--and asks about
anti-Semitic remarks of the right-wing think tank's co-founder,
or his employment discrimination lawsuit.

Heritage is now "caught between the shit and stink"--to use the
great expression of the father of **Ruth Goldstock** (see below).

If they expressly bar Gahr they'll be overtly discrimination and
 conceeding the existence of somebody that, just like
Tucker Carlson, they want to pretend does not exist.

But if they let Gahr  attend that could end up being very embarrassing.

He might start asking Chaffetz
questions like this, "Since Republicans are always demanding
that Democrats disavow that freaky Minnesota congressman
for her anti-Semitic remarks would you like to condemn
the co-founder of Heritage for anti-Semitic remarks?  And
would you urge other prominent conservatives and Republicans
 to do so?  They've kept quiet about it for the last 18 years but do you

 

think they should finally getting around to doing it?"

Anyway, here is an approximation from the status conference
Friday morning, with context added.

Judge Sadler: You have asked in your motion for
injunctive relief for the Court to order Heritage to
Either show cause, provide a non-discriminatory reason
for excluding you from their events, which you assert
are public accommodations, or grant your
permission to attend

Evan Gahr: Yes, and they have also threatened to expel
me if I attend anyway and ask about Weyrich
or this lawsuit

Judge Sadler: Mr. Farrington, your response?

Dan Farrington: Anybody who attends these events
needs to follow Heritage rules and regulations

Dan Farrington: He has called Heritage Foundation
president Kay Cole James "a neo-racist schoolyard
bully" so he might be disruptive at the conference
and needs to be expelled

Really?

I called a certain Washington Post media reporter
the "husband of an alleged human pooper scooper."

I called a very highly-regarded black WaPo reporter
"an affirmative action hire."

I chased the executive editor of the Washington Post with
a video camera for like a block and one half asking rude questions
we both knew he wouldn't answer.

"Hi.  You're Marty? I'm Evan. So how many black people does
the Washington Post need to fire before your report it??!!??"

I blatantly race-baited the black executive editor of the New York
Times--then bragged about it.

But the Washington Post and the New York Times are not
threatening to expel me from their public events/public accommodations
because, with my kind of record, I might be "disruptive."

I am so glad we have the Heritage Foundation to protect the nation
from constant assaults on free expression by the "ultra liberal"
and "intolerant" Washington Post and New York Times.

But I didn't say any of that because those are journalism arguments
not legal arguments.

Instead, I just stuck to relevant case law.

Evan Gahr: First of all, calling her a neo-racist
schoolyard bully was First Amendment protected
legitimate journalism activities

Evan Gahr: Secondly, it was also "protected activities"
under civil rights law

Evan Gahr: The EEOC defines "protected activities" to
include not just filing EEO complaints or lawsuits or supporting
somebody who does those things but also PROTESTING
any acts of discrimination under EEO law

Evan Gahr: So, by calling her a neo-racist schoolyard bully
I was protesting her illegally refusing to hire me because I am
Jewish and opposed to the anti-Semitism of Paul Weyrich

Evan Gahr: I would like to ask Mr. Farrington if I would be
expelled  if I ask about Weyrich



Dan Farrington: I don't know

Then, the conversation turned to other things, like the date
of the next status conference.

Concluding, the judge said, "Anything else."

Evan Gahr: Yes, I don't really understand what is going on
here. He talks vaguely about anybody attending these events
needing to follow rules and regulations

Evan Gahr: But I need to know specifically am I going
to be expelled if I ask about Weyrich

Judge Sadler:  Mr. Farrington?

Dan Farrington: I'll ask my clients

I win.

Heritage loses.

I knew once I got **neo-racist schoolyard bully Chris Byrnes**
and Kay Hall James  in front of a judge they would crumble like
the way all bullies crumble.

Although I don't have specific info it is Byrnes who probably
thought he had come up with a nifty strategy to skirt non-discrimination
laws by referring obliquely to conference participants needing to
follow Heritage regulations in order to intimidate me from asking about Weyrich.

But threats, under the law, need not be explcit.

Meanwhile,  my landmark Civil Rights Act lawsuit against Heritage
for essentially barring me from their events/public accommodations
in retaliation for my DC Superior Court lawsuit and threatening to expel
me if I go anyway and ask about Weyrich,  is now active.



I filed it last Saturday in the 24 hour drop box of the United States
District Court of Columbia.

But then I went back to NYC. So I mailed via express mail
a check for the $400 filing fee.

The Clerk's office got the check and put the case on the docket
on Wednesday.

I like looking at my case numbers and the Court stamp
on the complaint.

I look at that stuff all the time.

I have only looked at Wemple's article on me and Tucker
like three or four times since it was published nearly one year ago.

I have actually only read it carefully just one
time--months after publication.

But I look at the case numbers and the Court stamps
on my complaints all the time.

And think these cases mean these people can't harm
me with impunity anymore.

https://dailycaller.com/2014/12/25/its-a-wonderful-life-the-christmas-q/

Betsy Rothstein Reporter

December 25, 2014 12:34 PM ET

This year I decided to torture my sources, coworkers and other journalists with a
Christmas question.

# Q: "It's a Wonderful Life."  If
# someone in your life had never been

born how would your world have
turned out significantly different?
Excluding parents, spouses and kids.

Evan Gahr, freelance D.C. journo,
D.C. Gadfly, resident phone
enthusiast: "My grandmother Ruth.
Except from her, I grew up in an
apolitical family. When I was in fifth
grade and at her house, my
grandmother told me panoramic
stories about the founding of Israel,
the rise of Hitler, the Holocaust and
FDR, the depression and the New
Deal. Anyone who heard these
stories, so vivid and passionate,
would have thought she was a
Holocaust survivor or grew up on a
Kibbutz before the founding of Israel
or been one of the young lawyers who
came to Washington in the early
1930s to help Roosevelt set up the

New Deal. The moment I heard these stories I became entranced with current events and wanted to be part of them and have my opinion matter. I fell naturally into opinion journalism. I also got from these stories my Manichean view of the world. There were clear heroes and villains. Yeah, yeah. Not everything is black and white and people are complicated. But liberal journalists who think they are being really nuanced and sophisticated by pretending everything is a shade of gray are the real simpletons. Anyway this world view of stark absolutes made me determined to expose political and intellectual wrongdoing and dishonesty, best accomplished these days by getting people on the phone who normally hide behind secretaries because they know what I busted them for is indefensible. (The

articles are also a manifestation of my desire to have fun and be noticed.) I also got my fierce sense of Jewishness from my grandmother. We never talked about race issues — an abiding journalistic passion of mine these days. But one thing my grandmother said stood with me and has much to do with my current sensibility (an abhorrence of diversity fetishists). She said there are good and bad of every race. Diversity fetishists assume all blacks are good and therefore hiring more at newspapers would automatically be a boon for journalism. And they assume all white males are bad. My grandmother was beautiful and charming and smart and diplomatic. If she had been born in another era, when there more opportunities for woman and Jews, she could easily have ended up a senator, governor or

high-level diplomatic. She also loved and adored me so much and made me feel so special that years later all that gave me the fortitude to overcome big difficulties. The year before she passed away and was very feeble, I had my first op-ed published in the *New York Post*. My grandfather bought the paper and showed it to her. I said what did Bobbum think? He said, 'She didn't know what the hell it was. She kissed it.'"

POSTED BY WASHINGTON GADFLY EVAN GAHR AT 5:03 PM

0 COMMENTS:

POST A COMMENT

Subscribe to Post Comments [Atom]

<< Home



https://dailycaller.com/2016/03/04/dhs-inspector-general-interviews-journo-who-exposed-ice-whistleblower-smear-campaign/

By EVAN GAHR

The Department of Homeland Security Office of Inspector General last week interviewed this columnist about his recent conversation with the ICE flack who tried to discredit a whistleblower with confidential material.

No Washington journalist has provided information to government investigators since 1999 — also about a smear campaign, say several DC observers. Back then Christopher Hitchens claimed in an affidavit for Congressional Republicans that Clinton White House aide Sidney Blumenthal had privately told him Monica Lewinsky was a "stalker."

Worrying too much about the ethical implications of talking to the IG would have been typical Washington faux moralizing. DC journalists try to act like they are above everybody and everything. The reality is most are often knee deep in the stuff Washington Post blogger Erik Wemple's wife once got arrested for throwing.

I am a United States citizen and tax payer. I was talking to my government about encountering illegal behavior by a mid-level federal employee. Should a reporter who witnesses a Metro mugging not talk to reporters to maintain his objectivity?

Plus, in the roughly 15 minute conversation with an IG investigator and lawyer I pretty much just recounted my published account of the conversation with ICE press secretary Gillian Christensen.

Responding to a routine inquiry about Taylor Johnson, Christensen repeatedly demanded we talk off the record so she could explain the veteran agent was dishonest and a bad employee.

Christensen readily admitted she was relying on confidential information that could not be discussed on the record. But the federal Privacy Act bars such disclosures, whether public or private.

Inspector General Mark Bell, the IG press office and Assistant Secretary for Public Affairs Todd Breasseale all ignored questions about the conversation.

Johnson was fired last month after she refused $100,000 in hush money. She had a stellar record with ICE until running afoul of then Senate Majority Leader Harry Reid in 2013. His office complained to her Special Agent in charge about Johnson's refusal to approve special foreign investor visas for Chinese businessmen represented by Reid's son.

Following the complaints Johnson was stripped of her gun and badge without explanation. In June 2015, she testified about the retaliation before the Senate Committee on Homeland Security and Government Affairs.

The February 9 story here on her dismissal and slimming  prompted the Senate Homeland Security Committee to quickly ask the Office of Inspector General why previous inquiries about Christensen's apparent violation of the federal Privacy Act were ignored.

The IG first claimed to have no record of the email. But later conceded it was received. Meanwhile, Johnson is expected to file a complaint against DHS with the Merit System Protection Board this month and has set up a gofundme page for legal fees.

Tags : harry reid


Washington Gadfly

# DHS Inspector General Interviews Journo Who Exposed ICE Whistleblower Smear Campaign

https://dailycaller.com/2016/03/17/senate-committee-demands-dhs-produce-whistle-blower-smear-documents/

Washington Gadfly

# Senate Committee Demands DHS Produce Whistle-Blower Smear Documents

In a letter released Wednesday, Senate Homeland Security Committee Chairman [crscore]Ron Johnson[/crscore] (R-WI) asked Homeland Security Secretary Jeh Johnson for all documents and communications regarding the dismissal of ICE whistle-blower Taylor Johnson and his underlings' secretive effort to discredit her to reporters.

Confused by all these Johnsons?

It's hard not to be. The story also features a cameo by then-Senate Majority Leader [crscore]Harry Reid[/crscore] (D-NV).

Let's re-cap.

In 2013, Johnson, a decorated agent, was stripped of her gun and badge without explanation and placed on desk duty. The single mother of four was ousted right after Reid's office complained to her boss because she would not approve a special green card for a Chinese investor in the Las Vegas casino represented by his lawyer son Rory.

Johnson had also voiced concern that these EB-5 visas for foreigners like the younger Reid's clients who invest at least $500,000 in an American company were being issued to applicants without proper scrutiny, thereby endangering national security.

The Department of Homeland Security Office of Inspector General concluded in a March 2015 report that then-U.S. Customs and Immigration Services (USCIS) director Alejandro Mayorkas intervened in "a highly unusual matter" on behalf of Reid for the Las Vegas SLS Hotel and Casino then represented by his son.

Mayorkas, now DHS deputy secretary, also lobbied for companies tied to Virginia Gov. Terry McAuliffe, Hillary Clinton's half-brother Tony Rodham and former Pennsylvania Gov. Ed Rendell.

In June 2015, Johnson testified at a nationally televised committee hearing about her troubles with the agency and concerns about the program.

She recalled determining that EB-5 applicants from China, Russia, Pakistan and Malaysia were approved in "as little as 16 days" and case files "lacked the basic and necessary law enforcement queries."

Seven months later, ICE fired Taylor Johnson, ostensibly for lack of candor regarding a drug interdiction operation in 2011.

Interestingly, the first rationale ICE gave for her cutting her loose — hundreds of improper phone calls to a confidential informant from the Mexican border stop    quickly imploded. It turned out that informant's "number" on Johnson's phone log actually belonged to her mother.

Johnson, of course, never heard any objections about the 2011 action until Harry Reid's office turned the screws on her.

After declining a $100,000 severance package and non-disclosure agreement, Johnson was axed on Feb. 4.

That's right.

ICE lawyer J. Douglas Whittaker thought it was a bright idea to pay Johnson not to discuss what she already said at nationally televised Senate hearing!

Certainly, the testimony sparked a feverish effort by ICE to discredit her.



In response to a routine inquiry about Johnson last December, ICE press secretary Gillian Christensen, citing confidential information, demanded to convince the Washington Gadly off the record that she was a bad employee and liar.

The veteran flack berated her caller for refusing to talk off the record like reporters do "all the time."

Uh, you probably don't want to brag about that anymore!

In his letter, Sen. Johnson extensively cites the Gadly's story about the conversation with Christensen, which is also under investigation by the DHS inspector general. He seems eager to determine if she pulled a similar stunt with other reporters.

"In December 2015, a news outlet reported that an ICE spokesperson made disparaging comments about Agent Johnson to a member of the press and then tried to negotiate an off-the-record conversation in exchange for turning over private employment information about Agent Johnson."

"In discussions with my staff, ICE personnel have admitted to being aware of this allegation but could not say whether ICE had opened internal investigation into this allegation," the senator lamented. "If these reporters are accurate, it is disheartening that ICE would attempt to discredit a whistle-blower by shopping her personal information to reporters."

Saying that his committee takes "allegations of whistleblower retaliation seriously" he "respectfully" requested a boatload of potentially incriminating material:

 · all documents that ICE required Johnson to "sign upon termination" but were not legally required, an apparent reference to the confidentiality agreement that she refused to ink

—all documents relating to the decision to remove her

–all documents related to an offer by an ICE public affairs employee to give confidential information about her to the press

–all communications between or among ICE employees regarding media inquiries about her

–all documents that DHS provided to the Inspector General and federal Office of Special Counsel for whistleblowers

–a list of all requests from OSC and from the IG that they have not yet completely fulfilled.

Johnson asked for the material no later than 5 p.m. tomorrow.

Meanwhile, in separate letters to Secretary Johnson and Inspector General John Roth yesterday, he warned the Department not to retaliate against other whistle-blowers who provided crucial information for a committee hearing Tuesday on foreign visa programs.

In his opening statement, Johnson revealed an embarrassing failure of communications between Homeland Security Investigations agents and the United States Citizenship and Immigration Services division one day after the Dec. 2 San Bernardino terrorist attacks.

HSI learned that the man who supplied weaponry for the two attackers was scheduled to attend a Dec. 3 immigration hearing at the USCIS. But when agents arrived at the building determined to detain him USCIS would not allow them to enter.

The suspect never actually showed, but the whole thing made DHS sound like Keystone Cops.

Johnson told Roth and Secretary Johnson his office learned following the hearing ICE was trying to learn who tipped him off about the snafu. "I will not tolerate, nor should DHS tolerate, any effort to retaliate against federal employees for communicating with the Committee or Members of Congress."

His statement accompanying the letters cited the ICE "track record of retaliating against whistleblowers" like Taylor Johnson. "Those who have the courage to come forward should not be retaliated against."

In an email that sounded incongruous from a seasoned law enforcement officer, Johnson this morning sounded giddy that the committee publicly called out her tormentor.

"LOL I bet she's been pretty quiet now. I saw this in high school. Idiots and bullies would run their mouths, but then clam up as soon as someone called them out. Gossips like that have no integrity and are cowards. Is this gal even a cop or is she a desk jockey? How does she even know me?"

"It's very unusual that a local agent would be discussed at HQ," added Johnson, whose gofundme.com page seeks donations for legal costs. "I wonder who gave Jilly all the false gossip."

In more measured tones, her lawyer, Morris Fischer, welcomed the senator's actions. "We are very pleased with the efforts of Senator Johnson and the U.S. Senate Committee he chairs," he said. "They are making a difference in Taylor's situation which will influence other courageous federal whistleblowers to come forward and report government waste, fraud and abuse."

Given all the putrescence regularly detailed and exposed here, two refreshing and inspiring things about the Johnson saga are worth noting.

First, the Senate Homeland Security acted nobly without any public pressure. Almost nobody in Washington does the right thing about wrongdoing, unless it is first reported by The New York Times, Washington Post or Politico.

To cite one telling example: congressional Republicans knew about the Planned Parenthood videos weeks before they were finally released. But they said nothing publicly until after the story went viral.

But the Senate Homeland Security Committee immediately investigated the smear campaign against Johnson when they learned of it in the Jan. 29 article about her dismissal. Two staffers called the Gadfly the same morning the article was published to ask about Christensen.

In the ensuing weeks, even as Huffington Post Washington bureau chief Ryan Grim and WaPo reporter Joe Davidson, who actually wrote about Taylor's testimony, deliberately ignored the new developments, committee staffers made multiple inquiries to DHS officials.

The letter to Secretary Johnson was sent March 4, which was 11 days before New York Times reporter Ron Nixon, who knew about Johnson's dismissal almost from day one, finally wrote about her.

Also encouraging: Nixon is the first mainstream Washington reporter since WaPo gossip columnist Emily Heil last May to follow-up on an obvious and interesting Daily Caller story the Gadfly brought to their attention — some by me, others not — without first waiting for another major publication to cover it.

On the downside, he did not credit The Daily Caller. Nixon also omitted both the IG smear campaign investigation and Harry Reid's shenanigans.

But he is not perfect, and neither am I.

https://dailycaller.com/2014/09/30/lawsuit-capitol-police-officers-keep-jobs-after-duis-anthrax-hoax/

Evan Gahr Investigative Journalist

September 30, 2014 10:0

The United States Capitol Police has declined to dismiss a number of its officers who have been arrested for a range of offenses, including driving under the influence, assault and domestic violence, according to a lawsuit against the agency.

All of the officers kept their jobs — after being suspended, placed on administrative leave or given light duty as their cases were adjudicated. In one case, an officer who pleaded guilty to child pornography charges was allowed to retire honorably.

The allegations — which paint a disturbing portrait of the Capitol Police — are included in a federal lawsuit quietly filed last month by a veteran officer.

Leonard Ross, who is black, was forced to retire after his ex-wife obtained a restraining order against him for "an alleged act of assault" at her home.

But Ross believes the agency used the restraining order merely as a pretext to fire him. The Waldorf, Md., resident says he was actually fired for being party to an ongoing racial discrimination class action lawsuit against the department.

Federal law expressly prohibits dismissing or demoting an employee for alleging illegal discrimination. Ross claimed that other officers who had more serious run-ins with the law or just acted inappropriately were treated far less harshly because none had charged the department with equal opportunity violations.

Alleging racial discrimination as well, Ross said that none of those officers was black.

Officer Victor Bryant was arrested for assault and given administrative leave from Aug. 14, 2009 to Feb. 7, 2011. He was re-instated after a one-week suspension.

Officer Thomas McMahon was arrested for "entering a property with intent to damage." He was placed on administrative leave for "over a year." He then returned to work after a 30-day suspension.

Officer Daniel Nutter was arrested for driving under the influence and reckless driving. After some light duty, he was fully reinstated.

Officer Carlos Rivas was also arrested for DUI. He was put on light duty then assumed his normal job responsibilities.

Officer John Erickson was also arrested for DUI and put on light duty before returning to work. He has "since been suspended for falsifying his time and attendance records [but] remains employed by the agency."

Sergeant Alicia Sullivan got light duty and then returned to work after her DUI arrest.

Officer J.J. Pickett was arrested for "committing an anthrax hoax." Pickett got convicted for lying to police about his prank — passing off a sugary substitute he left in the Cannon House Office Building basement as anthrax — but got his job back.

Officer Larita Carney was given four to six months light duty for DUI, then charged with assault and placed in a diversion program. She is currently "working on background investigations."

Officer Roby Kennedy was "caught drinking alcohol on duty" and "making disparaging statements about Hispanics in a YouTube video" but "remains on the force."

Sergeant Dennis Bell was sentenced to five years in jail for distribution of child pornography but was allowed to retire and even given a retirement badge.

"There is no reasonable non-discriminatory explanation why Mr. Ross was treated so differently than these comparators," his lawsuit says.

The United States Capitol Police have not yet replied to the complaint.


But other police departments do not accord their officers the kind of gentle treatment that Ross alleges.

The New York Police Department public information office told The Daily Caller that any cop arrested is immediately suspended without pay for 30 days.

Boston Police Department Sergeant Mike McCarthy said officers are automatically placed on administrative leave with pay.

Philadelphia police officers are suspended for 30 days with intent to dismiss.

According to his lawsuit, Ross was hired in 1987. He had an unblemished employment record until he joined a 2001 class action lawsuit against the Capitol Police for historical and ongoing racial discrimination.

The following year, Ross sued the Capitol Police individually, for retaliation and racial discrimination, alleging that he was wrongly denied a promotion to sergeant and subjected to unequal discipline compared to white officers.

In 2005, his individual claim was folded into the class action lawsuit, which has since been repeatedly amended, as some litigants settled and others passed away.

In 2011, Ross kicked off a series of events that culminated in his dismissal when he told superiors that his ex-wife, Capitol Police officer Felicia McDonald, was "having an improper relationship with a convicted felon" in violation of departmental rules.

McDonald was suspended in May 2012. She "asked Mr. Ross to permit their two daughters" for whom he had physical custody "to reside with her."

Ross refused. On June 30, 2012 when Ross went to McDonald's home and "collected" his eight-year-old daughter, the child's 18-year-old sister called the police. McDonald was not home at the time.

Thirteen days later, she obtained a "one-year Civil Protective order" against Ross "for an alleged act of assault," which the lawsuit does not specify. He was barred from keeping a gun or having any contact with his ex-wife or visiting her home. But no criminal or civil charges were filed.

Ross was placed on administrative leave.

In August 2013, Ross resigned in lieu of termination and loss of his pension.

Ross sued the Capitol Police on Aug. 15, 2014 in Washington federal district court for violating the 1995 Congressional Accountability Act, which applied the 1964 Civil Rights Act to Congress.

TheDC emailed detailed inquiries about the lawsuit to the Capital Police Information Office, asking about the total number of arrested officers since 2009, whether any of the arrested officers provided personal security for congressional leaders, and its general policies on such arrests.

Officer Shennell Antrobus responded: "The USCP does not comment on personnel matters or pending litigation."



Leonard Ross and his lawyers did not respond to requests for comment.